499 A.2d 289

**COMMONWEALTH of Pennsylvania, STATE BOARD OF NURSE EXAMINERS, Appellant,**

v.

**Ann Marie RAFFERTY, Appellee.**

Supreme Court of Pennsylvania.

Argued May 16, 1985.

Decided Sept. 24, 1985.

Mary S. Wyatte, Jerome P. Grossi, Harrisburg, Joyce McKeever, Bureau of Professional & Occupational Affairs, Philadelphia, David F. Phifer, Dept. of State, Harrisburg, for appellant.

Daniel L. Thistle, Philadelphia, for appellee.

Before NIX, C.J., and LARSEN, McDERMOTT, HUTCH-INSON, ZAPPALA and PAPADAKOS, JJ.

## OPINION

ZAPPALA, Justice.

This is an appeal by the Commonwealth of Pennsylvania, State Board of Nurse Examiners (Board) from the Commonwealth Court, 80 Pa.Cmwlth. 603, 471 A.2d 1339, order reversing the Board's order revoking the nursing license of Appellee Ann Marie Rafferty. The Board's action was taken pursuant to Section 14(3) of the Professional Nursing Law, Act of May 22, 1951, P.L. 317, *as amended*, 63 P.S. § 224(3), which provides that the Board may suspend or revoke any license where the Board shall find that "the licensee has wilfully or repeatedly violated any of the provisions of th[e] act or of the regulations of the Board."

The findings of the Board, which are supported by the record, establish that Appellee was employed by Thomas Jefferson University Hospital as a registered nurse in the Neurosurgical Intensive Care Unit during November, 1978. She was responsible for the care of patient Richard Bartus during the shift from 11 p.m. on November 1, 1978 to 7 a.m. on November 2, 1978. Following surgery, the patient had developed serious complications which left him comatose and in respiratory distress. His pupils were fixed and dilated and he was unresponsive to deep pain stimuli. His respiration was maintained on a Bennett MA–I Respirator, while his blood pressure was maintained by the infusion of dopamine. The patient was presumed to be brain dead, but this status had not been conclusively established at the time of Appellee's shift. The results of two electroencephalograms had not been attached yet to his chart. The patient did not have a "no code" order in his chart. It was the Hospital's policy that in case of respiratory or cardiac failure that all efforts for resuscitation were to be attempted, unless a "no code" order was documented.

The record establishes that the Appellee had reviewed the patient's progress notes covering the previous three or four days prior to undertaking his care. The Appellee was aware of the patient's condition from this review. She was also aware that the patient had "coded" recently and that the cause of the code was that he had suffered primary respiratory failure. The Board further found that at approximately 3:30 a.m., the Appellee remarked to Jeffrey Cameron, another registered nurse, that she was going to bathe the patient and proceeded to his room. Prior to the bath, Appellee checked and recorded the patient's vital signs, disconnected the ventilator from his endotracheal tube, suctioned the secretions which were present, and reconnected the ventilator. During the suctioning procedure, there were no signs that indicated the patient was assisting ventilation.

At approximately 3:45 a.m., the Appellee noted that the patient was experiencing rare premature ventricular contractions (PVCs), which were abnormal for him. She determined they were not life-threatening after viewing the monitor and proceeded with the bath. After bathing the head and neck region, Appellee tested the patient for spontaneous respiration.

Appellee performed the test by adjusting the ventilation so that the patient was given two to three deep breaths of 100 percent oxygen, then removing the ventilator tubing from his endotracheal tube and laying it across his chest, and observing him for any signs of movement. During the test, the patient was off the ventilator for a period in excess of thirty seconds during which time he was deprived of pure oxygen and placed on room air. The Appellee did not touch the patient or administer any type of care during the test. The patient displayed no signs of spontaneous respiration.

The Appellee then reconnected the ventilator tubing, resupplying him with pure oxygen, and continued with the bath. She noticed a significant change in the patient's vital signs as his blood pressure drastically decreased and his PVCs drastically increased. The Appellee failed to incorpo-

rate the cardiac monitor strips documenting the PVCs into the patient's chart.

The Appellee sought out Nurse Cameron to ask his opinion regarding the changes. Noting that the cardiac monitor registered asystole (i.e. lack of heartbeat), Cameron told the Appellee to call the code and began to ventilate the patient. Instead, the Appellee called a third registered nurse, Mary Johnston, who immediately administered CPR. The Appellee was told once again to call the code. She then left the room, called the neurosurgical resident on duty, and then called the code. The code team arrived while Johnston and Cameron were attempting to resuscitate the patient. The code was terminated after the code leader received a call from a physician. The resuscitation attempt was unsuccessful, and the patient was pronounced dead at 4:20 a.m.[1]

The Appellee was subsequently charged with violations of Board regulations set forth in 49 Pa. Code § 21.11(a)(1) and (4) and 49 Pa. Code § 21.13. Section 21.11(a) provides that,

The registered nurse assesses human responses and plans, implements and evaluates nursing care for individuals or families for whom the nurse is responsible. In carrying out this responsibility, the nurse performs all of the following functions:

(1) Collects complete and ongoing data to determine nursing care needs.

\* \* \* \* \* \*

(4) Carries out nursing care actions which promote, maintain, and restore the well-being of individuals.

Section 21.13 provides,

External cardiac resuscitation and artificial respiration, mouth-to-mouth, are procedures regulated by this section,

---

1. The Appellee's statement of facts and argument rely heavily upon the deposition testimony of Dr. Donald Myers which was taken on August 7, 1981 in a civil action by Appellee against Thomas Jefferson University Hospital filed in the Philadelphia County Court of Common Pleas, No. 3035 August Term 1979. The Board denied the Appellee's request to reopen the record to incorporate the deposition testimony. While this testimony has been made a part of the reproduced record, it is not properly before us and has been disregarded.

and such functions shall not be performed unless both of the following provisions are met:

(1) External cardiac resuscitation and artificial respiration, mouth-to-mouth, shall only be performed by a nurse on an individual when respiration or pulse, or both, cease unexpectedly.

(2) A nurse shall not perform external cardiac resuscitation and artificial respiration, mouth-to-mouth, unless the nurse has had instruction and supervised practice in performing the procedures.

After a hearing, the Board concluded that the Appellee had violated § 21.11(a)(1) and (4) of the regulations: (1) by allowing the patient in his condition to remain disconnected from his respirator; (2) by leaving the patient upon noting that his cardiac monitor displayed asystole; (3) by failing to immediately call for the code blue team while Cameron and Johnston were engaged in resuscitation procedures; and (4) by failing to attach the cardiac monitor strip displaying the patient's PVCs to his chart. The Board also found that the Appellee had violated § 21.13 by failing to perform external cardiac resuscitation and artificial respiration, even though she was qualified to render this necessary treatment. The Board thereupon entered an order revoking the Appellee's license.

On appeal, the Commonwealth Court reversed the order of the Board. The court relied upon its opinion in *Leukhardt v. State Board of Nurse Examiners,* 44 Pa.Cmwlth. 318, 403 A.2d 645 (1979), defining "wilful" under § 14(3) of the Professional Nursing Law as "an intentional, designed act and one without justifiable excuse." 403 A.2d at 648, citing *Commonwealth ex rel. Wright v. Hendrick,* 455 Pa. 36, 312 A.2d 402 (1973). The court held in the instant case that "a mere intentional act which results in a violation is not a 'designed act' unless, by motivation, the act was intended to violate the regulation." 471 A.2d at 1341. Reasoning that the Board found no deliberate or knowing violation, but only acts which deviated from accepted practice, the court concluded that Appellee's actions were simply

errors of judgment. The court held that the Board's conclusion that these actions deviated from acceptable practice did not raise her conduct to the level of wilfulness, absent an intent to violate.[2]

This Court granted allocatur to address the issue of first impression of whether the burden of proving a wilful violation requires a showing of a specific intent to violate the statute or the rules and regulations promulgated thereunder.

■■■■ We approve of the Commonwealth Court's statement in *Leukhardt,* supra, of the definition of "wilful" under § 14(3) as "an intentional, designed act and one without justifiable excuse." The Commonwealth Court erred here, however, in holding that the Board must prove a specific intent to violate the act or its rules and regulations in order to establish a wilful violation. Such a holding disregards the very purpose of the Board of insuring "safe nursing services for the *citizens* of the Commonwealth." 49 Pa. Code § 21.3 [Emphasis added]. The pre-eminent interest of the Board is for patient care. To effectuate this purpose, it is the Board's responsibility "[t]o assure safe standards of nursing practice through ... the regulation of the practice of nursing in this Commonwealth." 49 Pa. Code § 21.3(2). An interpretation of the term "wilful" which incorporates an element of the nurse's motivation would subordinate the interest in patient care to that of policing a nurse's conduct. It would then become irrelevant whether the nurse's action exposed a patient to unsafe nursing services as long as the unacceptable action was not intended to violate the act or regulations. Not only would this be an unintended result of the statutory language, it is contrary to the unambiguous statement of the Board's purpose.

2. On her appeal to the Commonwealth Court, Rafferty raised additional issues which were not addressed by that court, including the constitutionality of the regulations, the presence of the hospital's attorneys at the hearing, and the Board's failure to reopen the record for Dr. Myer's deposition testimony.

■ We must determine then whether the Board's adjudication is supported by substantial evidence. 2 Pa.C.S. § 704. The Board concluded that the Appellee wilfully violated 49 Pa. Code § 21.11(a)(4) first by allowing the patient to remain disconnected from the respirator. The Board found this to be the most serious deviation from acceptable nursing practice.

The Commonwealth introduced the testimony of Isabelle Stanshine, a registered nurse employed at Thomas Jefferson University Hospital from June, 1977 to April, 1980. Qualified as an expert in the field of critical care, Stanshine testified that there were limited instances in which a nurse could properly remove a patient from a respirator—e.g. to transport a patient or during a suctioning procedure. She stated, however, that the Appellee's actions in taking a patient in a comatose condition off the respirator was not one of those limited instances and was a deviation from acceptable nursing standards. [R. 155a–161a; 321a]. Stanshine further testified that spontaneous respiration should not be evaluated by a nurse and that it was not a nursing function at the Hospital. [R. 165a–166a; 314a–316a].

Stanshine's expert opinion that removing a comatose patient from a respirator was inappropriate was reiterated by the Appellee's own expert witness, Kenneth Lawler, a supervisor of nursing at the Hospital. Lawler also testified that it would be appropriate for a nurse to check for spontaneous respiration under certain circumstances—e.g., a patient showed signs of becoming conscious. [R. 202a–203a]. Lawler stated that such a test would be improper, however, when a comatose patient did not display signs of activity. [R. 207a–208a].

From the testimony of the two expert witnesses, the Board found that the acceptable method to check for spontaneous respiration is to use the assist button on a respirator to determine whether a patient's own efforts are triggering respiration. This method assures that a patient is not deprived of oxygen. The method used by Appellee is to

be used only when a previously unconscious patient shows signs of regaining consciousness. It is contraindicated and an unacceptable procedure for the patient under Appellee's care. [Findings of Fact Nos. 49–51]. The Board's conclusion that the Appellee's conduct was a wilful violation of § 21.11(a)(4) was amply supported by the record.

The Board concluded that the Appellee's failure to perform external cardiac resuscitation and artificial respiration was a wilful violation of 49 Pa. Code § 21.13, as well as § 21.11(a)(4). Section 21.13 was intended, however, as a limitation of the individuals who may perform resuscitation and respiration and the circumstances under which they may be performed. Appellee's failure to undertake such efforts although qualified to do so was a wilful violation of § 21.11(a)(4), but was not a wilful violation of § 21.13. Therefore, the Board's finding that Appellee's actions wilfully violated § 21.13 is not supported by the record.

The Board's conclusions that the Appellee wilfully violated § 21.11(a)(4) by leaving the patient, by failing to call the code team, and by failing to attach the cardiac monitor strip to the patient's chart are also supported by substantial evidence. It was undisputed that the cardiac monitor strip documenting the rare PVCs was not attached to the patient's chart. Although Appellee recognized the importance of charting the abnormal pattern, she testified that the strip had been thrown out. She stated this had been done at the order of Isabelle Stanshine [R. 296a–297a]. Stanshine refuted this testimony. She testified it was the Hospital's policy to save the strip whenever a change occurred. [R. 313a]. It is apparent that the Board resolved the issue of credibility against the Appellee. Her expert testimony indicated that upon noting that the patient exhibited rare PVCs, it is the nurse's responsibility (1) to refer to the patient's chart to determine if similar PVCs had been documented; (2) to immediately document the PVCs; and (3) to observe for increasing frequency to determine if a trend is present. [R. 161a–162a]. Appellee failed to do so.

The testimony of Nurse Cameron and Nurse Johnston was that the patient's cardiac monitor registered a flat line indicating a lack of heartbeat. [R. 44a; 122a] Cameron testified that the Appellee left the patient to seek his opinion of the heartbeat. Both testified that the Appellee failed to respond to instructions to call a code until commanded to do so for a second time. [R. 45a–47a; 123a] Appellee conceded that she may have been told twice to call a code. [R. 289a].

Stanshine testified that upon noting a change in the cardiac monitor, the nurse should check the patient for a carotid pulse, insure that the leads and the monitor's "inop" signal were connected, summon another nurse to call a code, and begin resuscitation. [R. 162a; 179a]. She indicated that Appellee was capable of recognizing the elementary arrhythmia displayed on the monitor and that she did not require another opinion.

The evidence established that PVCs are a basic arrhythmia which may be seen if a patient is hypoxic—i.e. suffering from a lack of oxygen. [R. 185a; 290a—291a]. Appellee testified that she understood the relationship between the heart and lungs. She knew that a hypoxic state may be indicated by PVCs on the cardiac monitor. Nevertheless, she abandoned the patient when the PVCs were shown on the monitor. Her response was improper as she should not have left the patient. [R. 163a]. The other nurses who entered the patient's room undertook the necessary resuscitation efforts and emergency measures which the Appellee had failed to do.

Accordingly, the order of the Commonwealth Court is reversed. Because of the Commonwealth Court's resolution of the issue of whether specific intent to violate the regulations was required to find a wilful violation, the court did not address the remaining issues which had been raised on appeal to that court. Therefore, we must remand this case for further proceedings consistent with this opinion.

FLAHERTY and McDERMOTT, JJ., did not participate in the consideration or decision of this case.

PAPADAKOS, J., concurred in the result.

## JUDGMENT

ON CONSIDERATION WHEREOF, it is hereby ordered and adjudged by this Court that the Order of the Commonwealth Court is reversed in part and remanded in part.