2009 VT 94

## In re Appeal of David Chase, M.D.

[987 A.2d 924]

No. 08-191

Present: **Reiber, C.J., Johnson, Skoglund and Burgess, JJ., and Martin, Supr. J. (Ret.), Specially Assigned**

Opinion Filed August 28, 2009

*William H. Sorrell*, Attorney General, and *Michael O. Duane* and *Bridget C. Asay*, Assistant Attorneys General, Montpelier, for Petitioner-Appellee/Cross-Appellant.

*R. Jeffrey Behm* and *Eric S. Miller* of *Sheehey Furlong & Behm P.C.*, Burlington, for Respondent-Appellant/Cross-Appellee.

¶ 1. **Burgess, J.** Dr. David Chase appeals the decision and judgment of the Medical Practice Board concluding that he engaged in unprofessional conduct in evaluating and recommending several patients for cataract surgery. The State cross-appeals, arguing that the Board should have found that Dr. Chase's conduct included a willful violation of the statutory prohibition against filing false reports. We affirm.

¶ 2. Dr. Chase practiced general ophthalmology, with a focus on the diagnosis and surgical removal of cataracts, in the Burlington area for over thirty years. In July 2003, the State moved to summarily suspend Dr. Chase's medical license for allegedly recommending and performing cataract surgeries that were not medically necessary. At the summary-suspension hearing, the State alleged that Dr. Chase had engaged in willful misrepresentations as to recommended treatments, willful falsification of reports and records, and immoral, unprofessional, and dishonest conduct. In December 2003, the State charged Dr. Chase with 136 counts of unprofessional conduct concerning thirteen patients for whom he had recommended cataract surgery. The Board proceedings were stayed while Dr. Chase was tried on federal criminal charges, of which he was eventually acquitted.

¶ 3. Between September 2006 and February 2007, a three-member committee of the Board conducted a hearing on the merits of the charges against Dr. Chase. The State presented evidence from eleven patients and several ophthalmologists who had examined those patients. Dr. Chase testified and presented expert testimony. The committee made detailed findings and recommended that the Board find that Dr. Chase had engaged in unprofessional conduct with respect to his treatment of ten of the eleven patients. Both parties filed exceptions to the committee's report. The Board largely adopted the committee's findings and recommendations, and sanctioned Dr. Chase by imposing conditions for reinstating Dr. Chase's lapsed license.

¶ 4. The Board's determination of unprofessional conduct was based, among other things, on findings that Dr. Chase made inaccurate diagnoses, failed to engage his patients in adequate discussions about their vision before recommending surgery, and made confusing and misleading statements to his patients as to

whether they should obtain a second opinion. The Board found that Dr. Chase's conduct toward each of the ten patients represented a gross failure to exercise the degree of care exercised by ordinary, careful physicians in similar situations, in violation of 26 V.S.A. § 1354(a)(22). The Board also found that Dr. Chase's conduct with respect to some of the patients amounted to a failure to practice competently in violation of 26 V.S.A. § 1354(b). The Board further found that Dr. Chase's behavior toward some of the patients amounted to dishonorable conduct under 26 V.S.A. § 1398, which allows the Board to refuse to issue licenses to persons who, among other things, have engaged in immoral or dishonorable conduct. On the other hand, the Board declined to find that Dr. Chase's unprofessional conduct was willful or that the surgeries he performed were unnecessary.

¶ 5. On appeal, Dr. Chase argues that (1) certain Board findings are clearly erroneous; (2) the Board erred in concluding that his failure to engage his patients in a collaborative process aimed at evaluating the need for surgery was unprofessional conduct; (3) the Board erred in concluding that his description of certain cataracts as "dense" was unprofessional conduct; (4) the Board erred in concluding that his statements to patients in regard to obtaining a second opinion amounted to unprofessional conduct; and (5) the Board's errors and the State's conduct effectively deprived him of his right to defend himself. In its cross-appeal, the State argues that the Board erred in interpreting the word "willful" in 26 V.S.A. § 1354(a)(8) to require an intentional rather than merely a voluntary act. Before considering these arguments, we address the applicable standard of review.

■ ■ ¶ 6. The Medical Practice Board is "broadly empowered" to investigate and adjudicate charges of unprofessional conduct by licensees, to issue licenses, and to suspend, revoke, or refuse to issue licenses based upon a finding of unprofessional conduct. *Perry v. Med. Practice Bd.*, 169 Vt. 399, 403, 737 A.2d 900, 903 (1999). The Legislature has so empowered the Board " 'for the purpose of protecting the public.' " *Id.* (quoting 26 V.S.A. § 3101). Accordingly, we give considerable deference to decisions resulting from Board proceedings "in which a professional's conduct was evaluated by a group of his peers." *Braun v. Bd. of Dental*

*Exam'rs*, 167 Vt. 110, 114, 702 A.2d 124, 126 (1997).[*] Specifically, we defer to determinations that require the Board to apply its expertise or weigh whether certain behavior violated the standard of care pertaining to unprofessional conduct under the statute over which it has authority. See *id.*; *Hsu*, 2007 ND 9, ¶ 42 (stating that medical board's determination of physician's standard of care is technical matter entitled to appreciable deference); *Jerome v. Ohio State Bd. of Emergency Med. Servs.*, 2002-Ohio-4511, ¶ 23, 776 N.E.2d 126 (Ct. App.) (noting that "court must accord due deference to the board's interpretation of the requirements of the profession").

¶ 7. Our focus, then, is on the reasonableness of the Board's decision in light of its broad discretion and authority, not on whether we would have arrived at the same result. "This Court may not substitute its own judgment for that of the Board." *Braun*, 167 Vt. at 114, 702 A.2d at 127; accord *Hsu*, 2007 ND 9, ¶ 42 (noting that "it is not a court's function to act as a super board" and that "courts do not reweigh the evidence or substitute their judgment for a duly authorized agency"). "We will affirm the Board's findings as long as they are supported by substantial evidence, and its conclusions if rationally derived from the findings and based on a correct interpretation of the law." *Braun*, 167 Vt. at 114, 702 A.2d at 126. "Evidence is substantial if, in looking at the whole record, . . . it is relevant and a reasonable person could accept it as adequate to support the particular conclusion." *Id.* (citation omitted).

¶ 8. With this standard in mind, we consider Dr. Chase's first argument — that certain Board findings are not supported by the record. The first challenged finding concerns a patient who saw Dr. Chase in 2003 believing that she needed a new prescription for glasses. Dr. Chase diagnosed her as having dense central nuclear cortical cataracts, and recommended surgery for removal

---

[*] We reject Dr. Chase's argument that we owe no particular deference to the Board's decision in this case insofar as none of the Board members are ophthalmologists specializing in cataract surgery. Nine members of the seventeen-member Board are required to be licensed physicians, and only six members are not required to be associated with the medical field. 26 V.S.A. § 1351(a). Hence, the majority of the Board members have specialized knowledge pertaining to medical matters, and the Board's decisions are owed substantial deference. See *N.D. State Bd. of Med. Exam'rs v. Hsu*, 2007 ND 9, ¶ 42, 726 N.W.2d 216 (stating that decision of Medical Examiners Board comprised mostly of practicing physicians "is entitled to appreciable deference").

of the cataracts. He required the patient to get a blood-sugar test to rule out the possibility that fluctuating blood-sugar levels may have caused transitory cataracts. Because the patient was upset with Dr. Chase's diagnosis and did not believe that she had cataracts, she did not take the blood-sugar test, but instead scheduled an eye appointment with an optometrist. As it turned out, nothing resembling a dense nuclear cortical cataract was seen or diagnosed during the patient's follow-up examinations by other eye-care professionals. At the hearing, Dr. Chase suggested that he may have observed transitory cataracts caused by fluctuating blood-sugar levels or diabetes. The Board acknowledged that transitory cataracts can be caused by fluctuating blood-sugar levels or diabetes, but found no evidence that the patient in this case had either of these conditions.

¶ 9. Dr. Chase argues that no evidence supports this finding, which effectively placed upon him the burden of proving that the patient did not have fluctuating blood-sugar levels or diabetes. We disagree. The patient testified that she was not a diabetic. One of the eye doctors who later examined the patient disagreed that fluctuating blood-sugar levels could have caused the dense cataracts described in Dr. Chase's report. The Board found simply that there was no evidentiary basis for concluding that the cataracts described by Dr. Chase were caused by the patient being a diabetic or having fluctuating blood-sugar levels. The finding is not clearly erroneous.

¶ 10. Dr. Chase also challenges the Board's findings that the testimony of the patient-witnesses was credible. According to Dr. Chase, the Board ignored inconsistencies in the witnesses' testimony and the inherent implausibility of the witnesses being able to recall specific conversations during medical exams that had taken place years earlier. We find no merit to this argument. There is nothing particularly unusual about witnesses having inaccurate or inconsistent recollections of certain details, but at the same time having clear and certain memories of conversations that made a strong impression on them. Several of the patients testified as to statements made by Dr. Chase that shocked, surprised, or frightened them, making it more likely that they would remember the statements. Moreover, the consistency of the statements among the patient-witnesses enhanced their credibility. The fact that there may have been some inconsistencies in some

of the statements of the patients did not preclude the Board from finding that, in general, the patients' testimony was credible and accurate. See *Omega Optical, Inc. v. Chroma Tech. Corp.*, 174 Vt. 10, 20, 800 A.2d 1064, 1071 (2002) (noting that determination of credibility is solely within province of fact finder).

¶ 11. Dr. Chase also argues that the Board ignored much of his evidence in violation of 3 V.S.A. § 812(a), which, in relevant part, requires a final administrative decision to include a ruling upon each proposed finding. Again, we find no merit to this argument. We have held that an administrative tribunal is not required to "rule individually on each request" for a proposed finding, but rather the record need indicate only that the tribunal "considered and decided each proposed finding." *In re Vill. of Hardwick Elec. Dep't*, 143 Vt. 437, 445, 466 A.2d 1180, 1184 (1983). The purpose of this requirement "is to make a clear statement to the litigants, and to this Court if an appeal is taken, of what was decided and how the decision was reached." *Louis Anthony Corp. v. Dep't of Liquor Control*, 139 Vt. 570, 573, 432 A.2d 1186, 1188 (1981). Here, the hearing committee expressly acknowledged Dr. Chase's proposed findings, and the Board specifically ruled on each of Dr. Chase's exceptions to the hearing committee's report. The Board's detailed findings leave no doubt as to what was decided and how the decision was reached.

¶ 12. Next, Dr. Chase argues that the Board erred in concluding that he engaged in unprofessional conduct by failing to participate in a collaborative process with his patients to assess their need for cataract surgery. The source of this argument is the Board's finding that there should be a collaborative process between the physician and the patient to evaluate whether the patient's current visual function is meeting the patient's needs and not compromising the patient's quality of life. According to Dr. Chase, this standard is unsupported by the law or evidence.

¶ 13. We find no error with respect to the challenged finding. The record reveals that the parties stipulated to the standard of care set forth in the American Academy of Ophthalmology's Preferred Practice Pattern for indications and contra-indications for performing cataract surgery. Two of the goals stated in this Practice Pattern are to assess the impact of cataracts on the patient's visual function and quality of life and to inform the patient of the impact of cataracts on vision and of the potential

risks and benefits of surgery or nonsurgical alternatives so that the patient can make an informed decision about the treatment options. American Academy of Ophthalmology, Preferred Practice Pattern: Cataract in the Adult Eye 3 (2006). As noted, the challenged finding states that there should be a collaborative process between the physician and patient to assess the patient's visual function and its impact on the patient's visual needs and quality of life. This finding is completely consistent with the standard accepted by the parties, and the evidence demonstrated that Dr. Chase failed to meet the standard with respect to some of his patients.

¶ 14. Dr. Chase also complains that, by excluding the testimony of two of his nurses, the Board prevented him from demonstrating that his informed consent procedure was adequate. We find no abuse of discretion in the Board's ruling that, irrespective of the general thoroughness and attentiveness of the nurses in follow-up interviews with patients, the doctor himself has the responsibility to engage each patient personally in an assessment of visual function and its effect on that patient's visual needs and quality of life. If in fact the doctor failed to satisfy a reasonable standard of care in assessing a patient's need for cataract surgery, such a deficiency could not be overcome by even a thorough informed consent procedure conducted by nurses.

¶ 15. Next, Dr. Chase argues that the Board erred in ruling that he engaged in unprofessional conduct by describing cataracts as "dense." According to Dr. Chase, his description of cataracts as "dense" in his office medical charts was a nonessential, subjective charting practice peculiar to him that was beneficial to his patients' care but unimportant to anyone outside of his practice because it was not relied upon by anyone else. Dr. Chase contends that the Board adopted an unsupported, narrow definition of the word "dense" and ignored its own findings in suggesting that he offered patients surgery for insignificant cataracts.

¶ 16. We do not find any of these arguments persuasive. The Board acknowledged in its findings that ophthalmologists are not required to describe or rate the physical severity of their patients' cataracts, and that ophthalmologists' physical descriptions of cataracts have a subjective component and thus may vary to a significant degree. Nevertheless, the Board found that, generally, a cataract described as dense is one that is more clinically

significant and "presents characteristics that may be associated with a higher risk for intraoperative and postoperative complications." The Board further found that Dr. Chase's use of the word "dense" to describe the patients' trace or early cataracts "did not conform to the understanding of what that term means as established by the expert testimony and the AAO Preferred Practice Patterns." These findings are supported by the Practice Pattern accepted by the parties.

¶ 17. As the Board found, Dr. Chase inaccurately indicated in his medical charts that certain patients had cataracts he described as "dense" in character. These descriptions had significance in the sense that they were a factor in his recommending surgery for those patients. Other ophthalmologists who later examined the same patients testified that those patients had no cataracts or trace cataracts and in any case did not have the dense central nuclear cortical cataracts described in Dr. Chase's charts. Accordingly, notwithstanding the variety of imprecise terms used to describe cataracts, the evidence amply supports the Board's determination that Dr. Chase inaccurately evaluated certain patients as having dense cataracts, which amounted to a gross failure to meet a reasonable standard of care and to practice competently.

¶ 18. Along the same lines, Dr. Chase asserts that his nonessential, subjective charting practices are unimportant to anyone else and thus cannot form the basis of professional discipline. To be sure, the Board found that eye doctors do not normally rely upon other doctors' descriptions of cataracts in determining whether to recommend surgery. But the fact that eye doctors ultimately decide whether to recommend surgery based upon their own examinations does not suggest that they would have no interest in reviewing notes of what other doctors had seen in the past. The Board also expressly found that "[a]n ophthalmologist must ensure the evaluation of the patient and the patient's medical chart accurately documents the symptoms, findings, and indications for treatment." To the extent that this fundamental notion requires support beyond the Board's expertise, the finding is supported by expert testimony that it is important for eye doctors to document what grade a cataract is for future comparison because other doctors might later want to view previous medical records to determine what was seen at an earlier time. In short, the Board did not abuse its discretion by faulting Dr. Chase for engaging in inaccurate recordkeeping.

¶ 19. Dr. Chase also argues that the Board erred in finding that he engaged in unprofessional conduct with respect to statements he made to patients about obtaining a second opinion. On this point, Dr. Chase first briefly contends that, notwithstanding the Board's findings to the contrary, he informed his patients that another doctor might well disagree with his recommendation of surgery. The Board found Dr. Chase's testimony not to be credible as to what he told patients concerning a second opinion — that other doctors would tell them that not having surgery would not harm their eyes if they saw well enough to suit them. The finding regarding Dr. Chase's lack of credibility is supported by the testimony of several patients who contradicted his version of what he told the patients.

¶ 20. Dr. Chase further argues that the Board found him guilty of unprofessional conduct for discouraging eight patients from obtaining a second opinion, even though the State alleged in its complaint that he discouraged only four of the patients from obtaining a second opinion. The record does not support this argument. For each of the eight patients, the State's complaint cited misleading statements or inaccurate records Dr. Chase made regarding a second opinion and generally charged him with unprofessional conduct under 26 V.S.A. §§ 1354(a)(22) and 1354(b). With respect to four of those patients to whom Dr. Chase made statements that actively dissuaded them from obtaining a second opinion, the State also charged him with engaging in conduct that fell below the personal and moral standards set forth in 26 V.S.A. § 1398. The State's complaint was more than sufficient to place Dr. Chase on notice as to what the charges were, and, in fact, Dr. Chase vigorously defended himself and cross-examined each of the patients as to his conduct concerning their obtaining a second opinion. See *In re Kacey's, Inc.*, 2005 VT 51, ¶ 9, 178 Vt. 567, 879 A.2d 450 (mem.) (stating that due process is satisfied if parties are given an adequate opportunity to prepare and respond to issue raised at proceeding); *In re Vt. Health Serv. Corp.*, 155 Vt. 457, 460, 586 A.2d 1145, 1147 (1990) (holding that notice meets minimum due process standards as long as parties are sufficiently apprised of nature of proceedings and there is no unfair surprise). For its part, the Board made findings and conclusions on this point that essentially tracked the State's charges.

¶ 21. We also reject Dr. Chase's argument that the hearing committee abused its discretion by excluding as cumula-

tive the testimony of his nurses concerning his office's informed consent procedure. The proffered witnesses had no interaction with any of the eleven patients whose cases were before the committee. The committee and the Board concluded that the testimony would have been only marginally relevant and, further, would have been cumulative to other evidence that Dr. Chase had submitted. Given that the proffered evidence was not particularly relevant to Dr. Chase's conduct concerning second opinions, and that evidence of his informed consent office procedures had been presented and noted by the Board, the committee and the Board acted well within their discretion in excluding the evidence. See *Quirion v. Forcier*, 161 Vt. 15, 21, 632 A.2d 365, 369 (1993) (stating that appealing party has heavy burden to demonstrate that trial court abused its broad discretion in ruling on relevancy or admissibility of evidence); see also *In re Letourneau*, 168 Vt. 539, 554, 726 A.2d 31, 41 (1998) (stating that trial courts have "broad discretion to exclude marginally relevant evidence"); *Brown v. Whitcomb*, 150 Vt. 106, 111, 550 A.2d 1, 4 (1988) (noting that relevant evidence may be excluded if cumulative).

¶ 22. Dr. Chase also briefly argues that the Board's finding that he engaged in dishonorable conduct under 26 V.S.A. § 1398 is unsupported by the law, the Board's own findings, and the record evidence. He cites *Delozier v. State*, 160 Vt. 426, 431-34, 631 A.2d 228, 231-33 (1993), for the proposition that § 1398 authorizes the Board to revoke a physician's license only for conduct occurring outside the practice of medicine. According to Dr. Chase, the statute is not intended to address a physician's medical practices. We find no support for this argument. In *Delozier*, we concluded that § 1354, addressing unprofessional conduct, and § 1398, concerning dishonorable conduct, are not coextensive, *id.* at 432, 631 A.2d at 231, but we did not hold that § 1398 was applicable only to conduct engaged in outside the medical practice. Rather, we held that § 1398 "empowers the Board to determine the personal and professional qualifications of individuals who may obtain and hold a license." *Id.*

¶ 23. Dr. Chase also argues that the definition of the word "dishonorable" must have an element of purposeful wrongful conduct, and thus, given the Board's finding that his second opinion statements were not intended to mislead his patients, the Board's determination that he violated § 1398 must be reversed.

We reject this argument. Unintentional unprofessional conduct may be considered dishonorable in nature, especially when it has the potential to bring disrepute upon the individual doctor or the profession in general. Although the Board ultimately concluded that the evidence was insufficient to find that Dr. Chase willfully falsified records and intentionally performed what he knew to be unnecessary cataract surgery, the Board also concluded that Dr. Chase actively and aggressively discouraged some of his patients from getting a second opinion as to whether to have cataract surgery. The Board found that Dr. Chase's statements in these instances were misleading, confusing, and improper, and that they were made at a time when the patients were particularly vulnerable and concerned about their eyes. Indeed, some of these patients indicated that they were shocked by Dr. Chase's attitude and statements in response to their inquiries about obtaining a second opinion. The Board acted within its discretion in determining that Dr. Chase's behavior and statements, combined with the inaccurate statements placed in those patients' records as to whether they had received a second opinion or wanted surgery, amounted to dishonorable conduct subjecting Dr. Chase to revocation of his medical license.

¶ 24. Finally, Dr. Chase argues that all of the Board's errors and the State's improper actions deprived him of his ability to defend himself and thus violated his right to due process. We find no merit to this argument. For the most part, Dr. Chase rehashes the arguments rejected above. The record reveals that Dr. Chase received a full and fair opportunity to defend himself against the State's charges, and that he did in fact mount a vigorous defense to the charges in a thorough and lengthy merits hearing. His attorneys deposed all of the State's witnesses in advance of the hearing, conducted thorough cross-examinations of those witnesses, and presented Dr. Chase's case through expert witnesses, voluminous documents, and Dr. Chase's own testimony. There was no due process violation.

¶ 25. The State raises one issue in its cross-appeal, arguing that the Board erred in interpreting 26 V.S.A. § 1354(a)(8) as requiring the State to prove that Dr. Chase deliberately or purposely falsified records. The relevant statutory provision defines as unprofessional conduct "willfully making and filing false reports or records in his or her practice as a physician." *Id.* Finding a violation under this provision subjects a medical professional to

revocation of his or her medical license. The State would have us rule that the word "willfully," as used in this context, requires finding only that the professional engaged in the voluntary act of making a report that turned out to be inaccurate, even if the professional did not intend to file false information.

¶ 26. We decline to make such a ruling. "The word 'wilful' though given different definitions under different circumstances cannot well mean less than intentionally and by design." *State v. Burlington Drug Co.*, 84 Vt. 243, 252, 78 A. 882, 886 (1911); see also *Wendell v. Union Mut. Fire Ins. Co.*, 123 Vt. 294, 297, 187 A.2d 331, 332 (1963) (stating that willful means intentional as opposed to accidental, and that intentional "means an act done with intention of purpose, designed and voluntary"); *Kan. State Bd. of Nursing v. Burkman*, 531 P.2d 122, 126 (Kan. 1975) (noting that word willful has many meanings depending upon its context, but that "it generally connotes proceeding from a conscious motion of the will — an act as being designed or intentional as opposed to one accidental or involuntary"); *Commonwealth of Pa., State Bd. of Nurse Exam'rs v. Rafferty*, 499 A.2d 289, 292 (Pa. 1985) (declining to require State Board of Nurse Examiners to find specific intent to support willful violation, but approving definition of willful as "an intentional, designed act and one without justifiable excuse" (quotation omitted)). The Board did not err in declining to find a violation of § 1354(a)(8) based upon its conclusion that the inaccurate entries in Dr. Chase's records were the result of "missteps other than purposeful falsification."

*Affirmed.*