2009 VT 112

# In re Mitchell R. Miller, MD

[989 A.2d 982]

No. 09-222

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed November 6, 2009

506

*Debra L. Bouffard* and *Eric S. Miller* of *Sheehey Furlong & Behm P.C.*, Burlington, for Appellant.

*William H. Sorrell*, Attorney General, and *James S. Arisman*, Assistant Attorney General, Montpelier, for Appellee.

¶ 1. **Burgess, J.** Mitchell R. Miller, M.D. appeals from a decision of the Medical Practice Board to suspend his medical license pending a ruling on the merits on multiple charges of unprofessional conduct. Dr. Miller contends: (1) the statutory provision authorizing summary suspensions, 3 V.S.A. § 814(c), is unconstitutional on its face because it fails to provide for a pre-suspension hearing or a prompt and meaningful post-suspension hearing; (2) the statute as applied failed to comport with due process because the post-suspension hearing afforded no meaningful opportunity to present evidence and contest the charges, the Board failed to apply a clear-and-convincing evidence standard of proof, and the Board relied on inadmissible hearsay evidence; and (3) the evidence failed to support the finding of unprofessional conduct or demonstrate an imminent threat of harm justifying a wholesale suspension of his license. We affirm.

¶ 2. On March 31, 2009, the State moved to summarily suspend Dr. Miller's medical license based on a simultaneously-filed specification of charges containing fifty-five counts of alleged unprofessional conduct, a State investigator's affidavit, and an exhibit consisting of Dr. Miller's 2004 "letter of assurance" to the Board. Based on a review of the medical records of ten patients, pharmacy records, and several interviews, the State alleged, in summary, that Dr. Miller had repeatedly abused his authority by prescribing excessive quantities of powerful narcotics for patients

without noting and copying the prescriptions in patients' charts, conducting adequate medical histories and examinations, documenting the physical symptoms and medical bases for the prescriptions, considering indications of drug dependency and adverse side effects from the large quantities of narcotics prescribed, or accounting for the risk of drug abuse and diversion, all in violation of acceptable standards of professional conduct.

¶ 3. In addition, the charges alleged that Dr. Miller had altered patients' charts, failed to produce medical records requested by the Board, made material misrepresentations to the Board, and violated numerous provisions of an earlier letter of assurance to the Board. The letter was the product of a State investigation, dating from 2000, into pharmacist reports concerning Dr. Miller's prescriptions of large quantities of narcotics. The investigation remained open, and in 2004 resulted in a detailed letter of assurance from Dr. Miller agreeing to several conditions, including promises to consult regularly with a New Hampshire-based anesthesiologist concerning the use of narcotics to treat pain; to accept no new patients likely to require treatment for chronic pain; to prescribe no Schedule II drugs for periods longer than fourteen days; to scrupulously maintain patient charts, documenting their diagnosis, condition, and the rationale for prescribing controlled substances; to retain copies of all prescriptions for Schedule II drugs; to require all patients being treated for chronic pain to enter into written agreements governing their receipt and use of prescriptions for controlled substances; and to promptly comply with all Board requests for records.

¶ 4. On April 1, 2009, at its regularly scheduled monthly meeting, the Board convened an emergency hearing to consider the interim-suspension motion. The State was represented at the hearing, and the Board heard testimony from the State's investigator. Although a copy of the motion was mailed to Dr. Miller he was not afforded prior notice of the hearing or an opportunity to appear and rebut the charges. On April 3, 2009, the Board issued a decision and order, finding, inter alia, that the allegations, "if proven," would support a finding that Dr. Miller had engaged in unprofessional conduct; that the record revealed a history, dating from 2000, of abuses and violations in Dr. Miller's prescribing practices that had continued to the present, suggesting that further assurances could not be relied on; that these practices threatened the health and welfare of his patients and posed a risk

to the public; and that the public health, safety, and welfare required an immediate suspension of Dr. Miller's license. The Board indicated that a hearing on the merits would be scheduled "as soon as practicable."

¶ 5. Four weeks later, Dr. Miller filed with the Board a motion to reconsider and reinstate his license. Dr. Miller claimed that there was no emergency requiring the summary suspension of his license, that due process required a contested pre-suspension hearing or, at a minimum, a prompt post-suspension hearing, and that any Board action must be narrowly tailored to address the alleged harm, suggesting that the Board allow him "to continue his practice on the condition that he discontinue treating the[] [ten] patients" specified in the charges. The Board, in response, issued a procedural order indicating that it would hold a hearing at its next regularly scheduled meeting in mid-May 2009, where it would take evidence and testimony from the State's investigator and Dr. Miller limited to the matters and timeframes set forth in the investigator's original and supplemental affidavits. At the hearing, Dr. Miller's attorney cross-examined the investigator at length concerning his investigation, affidavits, communications with Dr. Miller and two of his patients, and pharmacy records. Dr. Miller submitted prefiled testimony, testified in person, was cross-examined by the State, and responded to questions from Board members. The Board declined to admit letters on Dr. Miller's behalf from two doctors and a nurse who had worked with him in the prison system, as well as a letter of endorsement from the administrator of a skilled nursing facility where he had consulted, ruling that they were outside the scope of the hearing.

¶ 6. On June 5, 2009, the Board issued a second decision and order, denying the motion to reconsider and continuing the suspension pending a resolution on the merits. The Board's decision revisited the State's charges and the issues in their entirety, setting forth extensive findings and conclusions based on the evidence previously submitted as well as that adduced at the hearing. Among its many findings were the following. Although Dr. Miller had been phasing out his private practice and was employed fulltime with Prison Health Services, a private corporation providing medical care to Vermont prisons, he had continued to treat at least seven patients in his private practice. Of these, only two had written drug agreements, and both were dated and did not reference the medications actually being prescribed. Dr.

Miller met his patients in a bare office, with no nursing or administrative assistance. Contrary to his claim that only one of his remaining patients was receiving pain medication, the evidence showed that Dr. Miller was prescribing pain medication to at least five patients, including narcotics to three, and a scheduled opiate substitute to another. Dr. Miller routinely wrote narcotics prescriptions for patients whom he did not regularly examine; wrote multiple narcotics prescriptions for patients weeks in advance, in quantities that exceeded the amount to be taken and, when questioned at the hearing, offered no rationale or explanation for the discrepancy. At least two patients in question had reported symptoms of drug dependence.

¶ 7. Based on the evidence, the Board found "that Dr. Miller's treatment of the patients in his private practice during the last month before the suspension of his license did not meet the standards of care" required by the Board's policy for the use of controlled substances; that "the evidence of record, in conjunction with the allegations" in the specification of charges, demonstrated unprofessional conduct; and further that "[t]he evidence adduced at the hearing by both parties confirmed the Board's [earlier] finding as to the imperative need for emergency action" based on the likelihood that Dr. Miller's patients would continue to receive substandard care to the detriment of their health and welfare, and that overprescribed narcotics would find their way to the black market, thus threatening the community at large. The Board also implicitly rejected Dr. Miller's alternative proposal to voluntarily cease treating the ten patients in question, concluding that his "grossly unprofessional and irresponsible treatment of this group of patients" cast doubt on his ability "to care for any patients at all." Accordingly, the Board directed that the suspension would remain in force pending further proceedings. Pursuant to the Board's order, the parties filed a stipulated discovery schedule the following week, providing for all discovery to be completed by late November 2009, and a hearing to be held in mid-December. This appeal followed.[1]

---

[1] The State asserts that, to the extent Dr. Miller's claims are addressed to the Board's initial order of April 3, 2009, the appeal — filed on July 2, 2009 — was untimely. The motion to reconsider effectively tolled the appeal pending the Board's subsequent decision and order on June 6, 2009, however, and the appeal was therefore timely.

¶ 8. Dr. Miller asserts several due-process violations which we address in turn. First, he contends that the provision of the Administrative Procedure Act authorizing the summary suspension of a license, 3 V.S.A. § 814(c), is unconstitutional on its face because it fails expressly to provide for either a contested pre-suspension hearing or a prompt and meaningful post-suspension hearing on the propriety of the emergency action.[2] The statute prohibits the "revocation, suspension, annulment, or withdrawal of any license" absent notice to the licensee of the facts which warrant the intended action and an opportunity to show "compliance with all lawful requirements for the retention of the license." 3 V.S.A. § 814(c). The statute goes on to authorize "emergency action" as follows: "If the agency finds that public health, safety, or welfare imperatively requires emergency action, and incorporates a finding to that effect in its order, summary suspension of a license may be ordered pending proceedings for revocation or other action. These proceedings shall be promptly instituted and determined." *Id.*

■ ■ ¶ 9. The constitutional right to due process guarantees certain procedural protections before the government may deprive an individual of a protected property right. *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976).[3] Fundamentally, due process requires notice and an opportunity to be heard "at a meaningful time and in a meaningful manner." *Fuentes v. Shevin*, 407 U.S. 67, 80 (1972) (quotation omitted). Generally, this means notice and a hearing prior to the deprivation, although the Supreme Court has recognized that "the necessity of quick action by the State[,] . . . when

---

[2] We note that Dr. Miller does not argue that the statute unconstitutionally fails to provide for prior notice of the summary proceeding or that he was denied due process as a result.

[3] There is no dispute here that Dr. Miller's interest in maintaining a license to practice his chosen profession is a "property right" protected by the due process clause, and that the Board's order of suspension constituted a deprivation of that interest. See *FDIC v. Mallen*, 486 U.S. 230, 240 (1988) (noting that bank officer's interest in continuing to serve in his job was "a property right protected by the Fifth Amendment Due Process Clause" and that FDIC's temporary suspension order "affected a deprivation of this property interest"); *Sabow v. United States*, 93 F.3d 1445, 1456 (9th Cir. 1996) (noting that a physician's medical license "was a constitutionally protected property interest"); *In re Smith*, 169 Vt. 162, 171, 730 A.2d 605, 612 (1999) (recognizing that, for purposes of due-process protection, a nurse whose license had been suspended "has a substantial [property] interest in maintaining her license, and thus her livelihood").

coupled with the availability of some meaningful means by which to assess the propriety of the State's action at some time after the initial taking, can satisfy the requirements of procedural due process." *Parratt v. Taylor*, 451 U.S. 527, 539 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327 (1986); see also *Alger v. Dep't of Labor & Indus.*, 2006 VT 115, ¶ 28, 181 Vt. 309, 917 A.2d 508 (recognizing that "[p]rotecting citizens from an immediate risk of serious bodily harm" constitutes an "extraordinary situation" justifying an exception to the due-process requirement of a predeprivation hearing) (quotation omitted).

¶ 10. There is no merit, therefore, to Dr. Miller's claim that § 814(c) violates due process on its face by permitting a summary suspension in exigent circumstances. Indeed, consistent with the high court's recognition of an emergency exception to the predeprivation hearing requirement, numerous states have adopted identical or similar statutes based on a provision in the Model State Administrative Procedures Act authorizing the summary suspension of a state-issued license where "public health, safety, or welfare imperatively requires emergency action." Revised 1961 Model State Admin. Procedures Act § 14(c), 15 U.L.A. 174, 429 (2000); see, e.g., Ariz. Rev. Stat. Ann. § 41-1092.11(B); Conn. Gen. Stat. § 4-182(c); 5 Ill. Comp. Stat. 100/10-65(d); Md. Code Ann., State Gov't § 10-226(c); Okla. Stat. tit. 75, § 314(C); S.C. Code Ann. § 1-23-370(c); S.D. Codified Laws § 1-26-29; Tenn. Code Ann. § 4-5-320(c).[4]

¶ 11. Although the parties here dispute whether the statute also requires a prompt *post*-suspension hearing to address the propriety of the Board's emergency action, the Supreme Court's decisions in this area leave no doubt that a licensee is entitled to meaningful review of the deprivation in a timely manner. *Fuentes*, 407 U.S. at 81. When a prompt hearing on the

---

[4] Although Dr. Miller acknowledges in his brief that a pre-suspension hearing may be dispensed with in "truly unusual emergency situations," he refers in his statement of facts to "the *alleged* emergency justifying an immediate suspension," noting that the State had taken the time to prepare a lengthy specification of charges prior to filing its motion for summary suspension. (Emphasis added.) The implication that no actual "emergency" warranted summary action by the Board in this case, however, is not carried forward in his argument. Rather, as discussed more fully below, he asserts that whatever emergency might have existed did not justify a wholesale suspension of his license, but at most only a limited restriction on the scope of his practice.

merits is not feasible because of discovery or other time-consuming constraints, therefore, an interim hearing on the emergency action *must* be afforded, regardless of what the statute provides. See *FDIC v. Mallen*, 486 U.S. 230, 241-42 (1988) (noting "the importance of providing prompt post-deprivation procedures in situations in which an agency's discretionary impairment of an individual's property is not preceded by any opportunity for a pre-deprivation hearing"); *In re Reiner's Case*, 872 A.2d 1038, 1042 (N.H. 2005) (where a rule authorizing the summary suspension of attorneys did "not provide a procedural framework for a post-suspension hearing" the court would "interpret the rule to require a post-suspension hearing to occur promptly so as to comply with due process"). Indeed, the record here discloses that, within one month of the summary suspension order, Dr. Miller requested, and the Board promptly granted, an evidentiary hearing to reconsider the order. Therefore, any facial or as-applied due-process challenge to § 814(c) predicated on the lack of a prompt post-suspension hearing was rendered moot. Cf. *Chase v. State*, 2008 VT 107, ¶ 15, 184 Vt. 430, 966 A.2d 139 (holding that a similar facial challenge to § 814(c) was rendered moot where the plaintiff's license had been reinstated pending final disciplinary action and a ruling would not affect his legal rights).[5]

¶ 12. Dr. Miller further claims that the evidentiary hearing he was afforded was a "sham" and offered no meaningful review of the Board's action. He faults, in particular, the Board's procedural order limiting the evidence at the hearing to matters raised in the State's evidence; its reliance on the State investigator's supplemental affidavit and alleged inadmissible hearsay; its acquiescence in the State's use of unnoticed exhibits to refresh Dr. Miller's recollection; its failure to require the State to support its case by clear and convincing evidence; and its exclusion of letters from four of Dr. Miller's former colleagues.

---

[5] While we conclude that the Board's prompt response to the request for a hearing in this case moots the constitutional claim, we take this opportunity to underscore the constitutional imperative of providing, upon timely request, a prompt post-suspension hearing following a summary-suspension order when a full hearing and final decision on the merits is unlikely to occur in the short term. See *Mallen*, 486 U.S. at 242-43 (recognizing the due-process requirement of a prompt post-suspension hearing, but holding that federal rules requiring a hearing and decision within ninety days on whether to continue the suspension of a bank officer pending a final administrative ruling did not violate due process).

■ ¶ 13. The Supreme Court has repeatedly stressed the flexibility of procedural due process requirements, observing that "unlike some legal rules, [due process] is not a technical conception with a fixed content unrelated to time, place and circumstances" but rather a "flexible [one that] calls for such procedural protections as the particular situation demands." *Mathews*, 424 U.S. at 334 (quotations omitted). Due process "tolerates variances in the *form* of a hearing appropriate to the nature of the case," *Fuentes*, 407 U.S. at 82 (quotation omitted), so that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971); see also *Lucas v. Hahn*, 162 Vt. 456, 459, 648 A.2d 839, 842 (1994) (recognizing that "[b]y its nature, due process comprehends a wide range of procedural protections tailored to myriad situations of state action affecting protected interests"). It is well settled, therefore, that "something less than a full evidentiary hearing" may be sufficient prior to final adverse action by an administrative agency. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 545 (1985) (quotation omitted).

■ ■ ¶ 14. Contrary to his claims here, we discern nothing in the record to suggest that Dr. Miller was not afforded a reasonable opportunity to contest the basis for the summary suspension. He asserts that the Board improperly limited the scope of the admissible evidence to matters raised in the State's case, but that was the very purpose of the hearing — to test the State's allegations of unprofessional conduct and the need for urgent action. See *In re Towle*, 164 Vt. 145, 153, 665 A.2d 55, 61 (1995) (purpose of a hearing before final agency action "is to determine whether reasonable grounds exist to believe that the charges against the employee are true and support the proposed actions"). As noted, the timing, nature, and purpose of a hearing may define its scope and procedural parameters. *Fuentes*, 407 U.S. at 82. Dr. Miller was afforded the opportunity to submit prefiled testimony challenging the State's evidence, to cross-examine the State's investigator on the charges, and to testify in his own behalf. This was sufficient to satisfy the requisites of due process pending a more comprehensive final hearing on the merits. See *In re Towle*, 164 Vt. at 153, 665 A.2d at 61 (due process was satisfied where grievant was notified that the State was considering terminating his employment, was given a description of the evidence, and had

an opportunity to present reasons why the disciplinary action should not be taken).

¶ 15. The only evidence proffered by Dr. Miller that the Board refused to admit were four letters from his former colleagues. To the extent that these were offered as testimonials to his good character, they were properly excluded as more appropriate to a merits hearing and ultimate questions relating to discipline and mitigation. To the extent that the letters contained information attesting to Dr. Miller's judgment while employed with Prison Health Services, we agree that they had some relevance to the question whether a remedy short of suspension (Dr. Miller had proposed that he "voluntarily agree to not provide medical care to the 10 patients listed in the Specification of Charges") would be sufficient to protect the public. The record shows, however, that the Board affirmatively considered Dr. Miller's argument that the charges "relate to only one small aspect" of his medical practice, but concluded that "[h]is grossly unprofessional and irresponsible treatment of *this* group of patients" reflected on "his suitability to care for *any* patients at all" and that the public health, safety, and welfare therefore required the immediate suspension of his license. (Emphasis added.) Accordingly, it is clear that the Board implicitly considered and rejected the limited-remedy option, and that any error in excluding the letters was harmless. See *Nichols v. Brattleboro Retreat*, 2009 VT 4, ¶ 9, 185 Vt. 313, 970 A.2d 1249 (an erroneous evidentiary ruling does not require reversal of the judgment where it does not affect the substantial rights of a party).

¶ 16. Dr. Miller also claims that the Board's reliance on a supplemental affidavit submitted by the State's investigator deprived him of fair notice of the charges to be addressed at the hearing. See *Devers-Scott v. Office of Prof'l Reg.*, 2007 VT 4, ¶ 59, 181 Vt. 248, 918 A.2d 230 (due process requires that a licensee receive notice of the charges against her). The original specification of charges and investigator's affidavit identified ten patients of Dr. Miller who had received excessive narcotics prescriptions with insufficient attention to their underlying medical condition, the medical rationale for their prescriptions, or the risk of drug dependency and diversion. At the ex parte hearing on April 1, 2009, the Board expressed concern as to how recently these practices had occurred, and requested a supplemental affidavit.

That affidavit, filed with the Board in early May and provided to Dr. Miller in advance of the hearing, detailed Dr. Miller's prescriptions of narcotics during the month of March 2009 for several of the patients identified in the charges. Thus, while the supplemental affidavit provided additional detail, it did not alter the basic charges against Dr. Miller or present an unfair surprise at the post-suspension hearing. See *In re Kacey's, Inc.*, 2005 VT 51, ¶ 9, 178 Vt. 567, 879 A.2d 450 (mem.) (due process is satisfied if the parties are "given an adequate opportunity to prepare and respond to the issues raised in the proceeding") (quotation omitted); *In re Vt. Health Serv. Corp.*, 155 Vt. 457, 460, 586 A.2d 1145, 1147 (1990) (holding that notice meets minimum due process standards as long as parties are sufficiently apprised of the nature of the proceedings and there is no unfair surprise).

¶ 17. Dr. Miller also complains that the Board relied on inadmissible and unreliable hearsay in the investigator's supplemental affidavit and testimony. The rules of admissibility in administrative proceedings before the Board are "relaxed" and allow the use of hearsay evidence if otherwise reliable. *In re Smith*, 169 Vt. 162, 173, 730 A.2d 605, 613 (1999). We need not, however, address this particular claim of error, as appellant's brief does not identify the portions of the affidavit and testimony to which he objects, nor does it clearly demonstrate that the Board relied on those portions to his detriment. See *In re Kacey's, Inc.*, 2005 VT 51, ¶ 10 (declining to address claim that the board erred in admitting hearsay testimony where the licensee failed to "identify the specific statements that were allegedly improperly admitted, nor how they were prejudicial"). Similarly deficient is the claim that the Board violated the rules of evidence and due process in allowing the State to cross-examine Dr. Miller about certain unnoticed documents to refresh his recollection. The argument fails to identify even the nature of the documents at issue (the record reveals that they were three narcotics prescriptions written by Dr. Miller for one patient in March 2009), and apart from a bare and unsupported assertion, makes no showing of prejudice.

¶ 18. Dr. Miller next contends that due process required the Board to apply a clear-and-convincing evidence standard of proof and that the Board erroneously failed to apply this or any other standard. The APA clearly provides that the State's burden is to establish unprofessional conduct by a preponderance of the

518

evidence. 3 V.S.A. § 129a(c). Although the Board did not expressly refer to this standard in its decision, we presume that its actions are correct, *In re Towle*, 164 Vt. at 148, 665 A.2d at 58, and Dr. Miller does not claim, nor does anything in the record suggest, that the Board improperly lowered or shifted the burden of proof.

¶ 19. We have also held that the preponderance-of-evidence standard satisfies due process requirements. *In re Smith*, 169 Vt. at 172, 730 A.2d at 612. Like the case at bar, *Smith* involved an interim suspension of a health care professional, a home-health nurse, pending a disciplinary hearing on the merits. Smith claimed, and the trial court agreed, that the Board should have applied a clear-and-convincing evidence standard given the severity of the loss of her livelihood. We disagreed and reversed. While recognizing Smith's "substantial interest in maintaining her license, and thus her livelihood[,]" we noted that the interest was "somewhat tempered" by the fact that the suspension was temporary pending the Board's final ruling, that the State had an equally "substantial interest" in safeguarding the public health and safety, and that the procedural protections afforded the licensee at the suspension hearing reduced the risk of an erroneous deprivation and supported a conclusion that the preponderance standard was sufficient to satisfy due process. *Id.* at 171-72, 730 A.2d at 612-13. We relied, in this regard, on *Steadman v. Securities & Exchange Commission*, 450 U.S. 91, 102 (1981), where the U.S. Supreme Court ruled that the preponderance standard satisfied due process in an administrative hearing before the SEC to determine whether violations of federal security laws warranted a disciplinary suspension. No decision by the United States Supreme Court has since reconsidered *Steadman* or suggested that our holding in *Smith* is inconsistent with the dictates of due process, and while some states — as we recognized in *Smith* — have concluded that due process requires proof by clear and convincing evidence in medical disciplinary proceedings, see, e.g., *Nguyen v. State*, 29 P.3d 689, 697 (Wash. 2001), many others have reached conclusions identical to ours. See, e.g., *Uckun v. Minn. State Bd. of Med. Practice*, 733 N.W.2d 778, 785 (Minn. Ct. App. 2007) (holding that the preponderance standard satisfied due process in a proceeding involving the temporary suspension of a physician's medical license); *N.D. State Bd. of Med. Exam'rs–Investigative Panel B v. Hsu*, 2007 ND 9, ¶¶ 19-27, 726 N.W.2d 216 (reviewing medical disciplinary cases and concluding

that the preponderance of the evidence standard satisfied due process); *Ongom v. State*, 148 P.3d 1029, 1038 n.6 (Wash. 2006) (Owens, J., dissenting) (collecting cases from "at least 21 other jurisdictions [that] have held that the preponderance standard is constitutionally appropriate . . . in professional disciplinary proceedings"). In short, we discern no basis to depart from our holding in *Smith* that the preponderance of the evidence standard comports with due process in license suspension proceedings.

¶ 20. Dr. Miller further contends that the evidence and findings were insufficient to support the Board's conclusion that he engaged in unprofessional conduct. Our review of the Board's disciplinary decisions is broadly deferential. As we recently observed, "we defer to determinations that require the Board to apply its expertise or weigh whether certain behavior violated the standard of care pertaining to unprofessional conduct under the statute over which it has authority." *In re Chase*, 2009 VT 94, ¶ 6, 186 Vt. 355, 987 A.2d 924. We will affirm the Board's findings if supported by substantial evidence, and its conclusions if rationally derived from the findings and a correct interpretation of the law. *Id.* ¶ 7.

¶ 21. Dr. Miller's specific claims in this regard are limited. First, he contends the Board's decision was fundamentally deficient because it was premised on the State's allegations and the qualifier that "if proven" they would establish unprofessional conduct. The Board's dispositive second decision and order contains forty-one separately numbered "findings of fact" relating to the evidence adduced by the parties in their submissions and testimony. These findings are unqualified, and formed the principal basis for its conclusions. As the Board specifically explained, "[t]he evidence at the hearing suggests that Dr. Miller's initial examination and his continuing oversight of his patents was superficial at best and not up to the strict professional standards required by the Policy [for the Use of Controlled Substances for the Treatment of Pain] for physicians prescribing narcotics." The Board also cited specific evidence in finding that Dr. Miller had failed to adequately discuss the risks of controlled substances with his patients or evaluate behaviors indicating the possibility of drug dependence or diversion; that he had prescribed narcotics in greater amounts than the actual dosages required; and that his "testimony at the post-suspension evidentiary hearing . . . failed to provide the missing rationale or adequate explanation of his

treatment and prescribing practices." Accordingly, the record does not support the claim that the Board's findings were based on surmise or were insufficiently tethered to the evidence.

¶ 22. Dr. Miller also claims that the Board's finding of unprofessional conduct is undermined by the absence of evidence that the narcotics prescriptions in question were not medically necessary or that actual diversion of drugs had occurred, and by the lack of expert testimony relating to the quantity and duration of the prescriptions. We discern no basis to conclude, however, that such additional evidence was essential to the Board's finding of unprofessional conduct. As noted, "we defer to determinations that require the Board to apply its expertise or weigh whether certain behavior violated the standard of care pertaining to professional conduct," *Chase*, 2009 VT 94, ¶ 6, and we will not, therefore, second-guess its conclusion that Dr. Miller's actions in prescribing narcotics in excessive quantity without an adequate rationale or concern for the risks of drug dependence and diversion violates the standards of professional conduct. Nor is expert testimony required for a board composed in substantial part of a licensee's peers. See *In re Lakatos*, 2007 VT 114, ¶ 15, 182 Vt. 487, 939 A.2d 510 (holding that a board composed of health care professionals may apply its own expertise and need not rely on expert testimony for guidance).

¶ 23. Finally, Dr. Miller contends that the evidence was insufficient to support the Board's conclusion that his continued practice posed an imminent risk to public health, safety, and welfare requiring the "wholesale summary suspension of his license." The argument does not challenge the Board's findings that Dr. Miller's prescribing practices jeopardized the health of the patients concerned, that these practices were likely to continue, and that immediate action was necessary to protect their health and safety. It rests instead on the claim that the Board was constitutionally compelled to "narrowly tailor" the remedy to meet the harm, and that something less than a suspension of his license was sufficient in this case to protect the public.

¶ 24. The argument raises interesting questions as to the scope of the Board's "emergency action" authority and its constitutional obligations. The Board was aware of the issue and solicited supplemental briefing from the parties. The State took the position that the Board's "emergency action" authority was

limited to the "summary suspension" provided by § 814(c), relying on the principle that an administrative agency's authority is generally confined to that expressly conferred by the Legislature or necessarily implied for the effective exercise of those powers expressly granted. See *Perry v. Med. Practice Bd.*, 169 Vt. 399, 403, 737 A.2d 900, 903 (1999). Dr. Miller argued for greater administrative flexibility, citing 26 V.S.A. § 1361(b), which provides that, if the Board finds the person charged to be guilty of unprofessional conduct, it may "condition, limit, suspend or revoke the license or practice of the person complained against; or take such other action relating to discipline or practice as the board determines is proper."[6] Dr. Miller proposed that he be allowed to retain his license on condition that he "voluntarily agree not to provide medical care to the 10 patients listed in the specification of charges," noting that there were no allegations of misconduct relating to his care of prison inmates while employed with Prison Health Services or in his consulting position with a skilled nursing facility.[7]

---

[6] Neither party cited 3 V.S.A. § 129(a)(3), which currently provides that, in exercising its disciplinary powers, a board may "[i]ssue warnings or reprimands, suspend, revoke, limit, condition, or prevent renewal of licenses, after disciplinary hearings or, in cases requiring emergency action, *immediately suspend*, as provided in section 814 of this title." (Emphasis added.) Interestingly, the statute had formerly provided that the Board may "[i]ssue warnings or reprimands, suspend, revoke, limit, condition or prevent renewal of licenses, after disciplinary hearings or, in cases requiring emergency action, *immediately*, as provided by section 814 of this title." *Id.* § 129(a)(4) (2003) (amended by 2007, No. 29, § 1) (emphasis added). Standing alone, the word "immediately" in the former version would appear to refer to the full range of actions available to the Board "after disciplinary hearing," including the power to "limit" or "condition" a license. The statute was amended in 2007, however, to insert the word "suspend" after "immediately," 2007, No. 29, § 1, a change which would appear to support the State's position that the Legislature intended to confine the Board's emergency authority to the power to suspend.

[7] On appeal, Dr. Miller argues that the Board could also have allowed him to retain his license on condition that he voluntarily "discontinue prescribing the pain medications at issue," but this proposal was not put before the Board, and claims raised for the first time on appeal will generally not be considered. *Alger*, 2006 VT 115, ¶ 14. Moreover, as discussed below, the Board determined that Dr. Miller's prescribing practices and treatment of the patients in question raised serious concerns about his overall judgment and ability to practice, which warranted a general suspension rather than a lesser remedy, and we discern no basis to second-guess this determination.

¶ 25. Ultimately, the Board was not required to resolve these issues, nor are we. As noted earlier, the Board implicitly assumed the power to limit Dr. Miller's practice pursuant to the agreement that he had proposed, but concluded that "[h]is grossly unprofessional and irresponsible treatment of *this* group of [private] patients raises justifiable questions about his suitability to care for *any* patients at all." (Emphasis added.) Essentially the Board determined that the evidence raised significant concerns about Dr. Miller's overall medical judgment and competence to practice among any group of patients in any setting, institutional or otherwise. Therefore, even if we assume, like the Board, that it had the power or even the obligation to narrowly tailor a remedy to meet the risk, we may not second-guess its considered judgment that Dr. Miller's unprofessional conduct was sufficiently serious ("grossly unprofessional and irresponsible" in the Board's view) to warrant a full suspension of his license pending the completion of disciplinary proceedings. See *Chase*, 2009 VT 94, ¶ 6 (observing that the Legislature has "broadly empowered" the Board "for the purpose of protecting the public" and that this Court must "defer to determinations that require . . . its expertise" and its "interpretation of the requirements of the profession") (quotations omitted); *Braun v. Bd. of Dental Exam'rs*, 167 Vt. 110, 114, 702 A.2d 124, 127 (1997) ("This Court may not substitute its own judgment for that of the Board."). Our concern in cases where "a professional's conduct was evaluated by a group of his peers" is necessarily limited to "the reasonableness of the Board's decision, not how we would have decided the case." *Braun*, 167 Vt. at 114, 702 A.2d at 127. Based on the record before it, the Board could reasonably conclude that a temporary suspension of Dr. Miller's license pending further proceedings was necessary to protect the public health, safety, and welfare. We may not, therefore, disturb the judgment.

*Affirmed.*